No. 22-2287

# In the United States Court of Appeals for the Third Circuit

THE CHEMOURS COMPANY FC, LLC,
*Petitioner*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, in his official capacity as Administrator
of the United States Environmental Protection Agency,
*Respondents*.

On Petition for Review of Agency Order

**PETITIONER'S BRIEF IN OPPOSITION
TO MOTION TO INTERVENE**

Allon Kedem
Brian D. Israel
Joel M. Gross
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel:  (202) 942-5000
Fax: (202) 942-5999
allon.kedem@arnoldporter.com

*Counsel for The Chemours Company FC, LLC*

# **TABLE OF CONTENTS**

BACKGROUND ........................................................................................2

    A.    Chemours Challenges EPA's Health Advisory .............................2

    B.    Movants' Factual Assertions Are Inaccurate, Incomplete, and Irrelevant.................................................................................6

LEGAL STANDARD .............................................................................10

ARGUMENT ..........................................................................................11

    A.    Movants Do Not Have a Significantly Protectable Interest in EPA's Health Advisory ...............................................................12

    B.    Denying Movants' Motion Will Not Impair Their Interests .......18

    C.    The Government Adequately Represents Movants' Interests ....................................................................................20

CONCLUSION........................................................................................24

CERTIFICATE OF BAR MEMBERSHIP .............................................26

CERTIFICATE OF SERVICE ...............................................................27

CERTIFICATE OF COMPLIANCE ......................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of People with Disabilities v. Herrera,*
   257 F.R.D. 236 (D.N.M. 2008) ..........................................................................18

*Athens Lumber Co. v. FEC,*
   690 F.2d 1364 (11th Cir. 1982) ........................................................................14

*Berger v. N.C. State Conf. of the NAACP,*
   142 S. Ct. 2191 (2022) .....................................................................................20

*Cameron v. EMW Women's Surgical Ctr.,*
   142 S. Ct. 1002 (2022) .....................................................................................11

*Clean Earth, Inc. v. Endurance Am. Ins.,*
   No. 15-cv-6111, 2016 WL 5422063 (D.N.J. Sept. 28, 2016) ...........................18

*DHS v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) .....................................................................................23

*Dimond v. District of Columbia,*
   792 F.2d 179 (D.C. Cir. 1986) .........................................................................21

*Donaldson v. United States,*
   400 U.S. 517 (1971) .........................................................................................12

*Fund for Animals Inc. v. Norton,*
   322 F.3d 728 (D.C. Cir. 2003) .........................................................................21

*Karcher v. May,*
   484 U.S. 72 (1987) ...........................................................................................24

*Kleissler v. U.S. Forest Serv.,*
   157 F.3d 964 (3d Cir. 1998) .........................................................11, 12, 20, 21, 24

*Liberty Mut. Ins. Co. v. Treesdale, Inc.,*
   419 F.3d 216 (3d Cir. 2005) .......................................................................12, 14

*Maine v. U.S. Fish & Wildlife Serv.*,
  262 F.3d 13 (1st Cir. 2001) ...................................................................24

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
  72 F.3d 361 (3d Cir. 1995) ...................................................12, 13, 14

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
  27 F.4th 792 (2d Cir. 2022)...................................................................16

*Ohio Valley Env't Coal., Inc. v. McCarthy*,
  313 F.R.D. 10 (S.D. W. Va. 2015) ........................................................19

*Pennsylvania v. President United States of Am.*,
  888 F.3d 52 (3d Cir. 2018) ...................................................11, 12, 15

*Pennsylvania v. Rizzo*,
  530 F.2d 501 (3d Cir. 1976) ..................................................................20

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943).........................................................................19, 23

*Brody ex rel. Sugzdinis v. Spang*,
  957 F.2d 1108 (3d Cir. 1992) .........................................................12, 18

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002).................................................................22

*United States v. Territory of Virgin Islands*,
  748 F.3d 514 (3d Cir. 2014) .........................................................21, 22, 23

**Statutes**

42 U.S.C. § 300f(5) ....................................................................................4

42 U.S.C. § 300g ........................................................................................4

42 U.S.C. § 300g-1(b)(1)(F) .......................................................................4

Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* ...................................4

**Rules**

Fed. R. Civ. Proc. 24(a)(2) ................................................................11, 12

**Other Authorities**

Ellen T. Chang, Exponent, *Epidemiology of Hexafluoropylene Oxide Dimer Acid and Its Ammonium Salt* (Mar. 15, 2022), https://tinyurl.com/2mtub5ke ............................................................10

EPA, *Public Water System Supervision (PWSS) Grant Program*, https://www.epa.gov/dwreginfo/public-water-system-supervision-pwss-grant-program ......................................14

Press Release, N.C. Dep't of Health & Hum. Servs., *N.C. DHHS Releases Summary of Selected Cancer Rates for Counties in Cape Fear Region* (June 29, 2017), https://www.ncdhhs.gov/news/press-releases/2017/06/29/nc-dhhs-releases-summary-selected-cancer-rates-counties-cape-fear-region ...................................................................................10

Movants fail to satisfy the requirements for intervention. They do not have a specific, legally cognizable interest in this litigation. Instead, they assert an interest in defending the lawfulness of the Health Advisory that is shared equally by other members of the public, and an interest in drinking water free from levels of contamination raising health concerns that is also shared by other members of the public. Nor will the relief sought by Chemours undermine Movants' asserted interest in enforcement of a 2019 Consent Order, under which Chemours agreed to provide alternative drinking water supplies to well-users in accordance with "any applicable health advisory." Enforcement of the Consent Order is not at issue here. Further, the Consent Order independently requires Chemours to provide well-users with another form of replacement drinking water supplies at 10 parts per trillion, which obligation will continue to apply even if this Court vacates the Health Advisory.

Movants also cannot overcome the strong presumption that the government will adequately represent their interests. Movants and EPA share precisely the same goal—defending the legality of the Health Advisory. Because this is a challenge to *agency action*, moreover, this Court's review is confined to the reasons and evidence on which EPA itself relied; Movants thus

can offer no argument distinct from those that the government will be making (or could make) itself.

While Movants do not satisfy the requirements for attaining party status through intervention, Chemours would not oppose a timely request by Movants to participate as *amici curiae*. Insofar as Movants believe they have a unique "perspective" on EPA's actions, they could offer it through an *amicus* brief.

## BACKGROUND

### A.     Chemours Challenges EPA's Health Advisory

**1.**     Fluoropolymers—extremely stable molecules composed of multiple carbon-fluorine bonds—are essential to a variety of key industries. To provide just a few examples, fluoropolymers are used in every car, airplane, and cellphone. They are also critical to maintaining the integrity and quality of most prescription drugs; to producing medical equipment such as catheters, saline bags, and filtration devices for newborns; and to manufacturing computer chips.

Fluoropolymers are also necessary for green technology: They are used to produce hydrogen from renewable sources and are at the heart of the hydrogen fuel cell. In sum, the responsible manufacturing of fluoropolymers

in the United States is critical to furthering U.S. technology leadership; onshoring key industries (including semiconductor manufacturing); and enabling American supply chain resiliency and security.

HFPO Dimer Acid is a polymerization aid used in the manufacture of fluoropolymers. It was developed by Chemours's predecessor, DuPont, as part of an EPA program aimed at ending the use of a previously utilized chemical, perfluorooctanoic acid, known as PFOA. In 2006, EPA invited DuPont and other chemical companies to participate in a voluntary stewardship program aimed at reducing PFOA emissions and product content. DuPont agreed to participate in the program and committed to—and then met—EPA's goals.

Pursuant to its stewardship commitments, DuPont undertook a research and development program to replace its use of PFOA as a polymerization aid. From those efforts, DuPont developed technology that uses HFPO Dimer Acid as a component of the patented GenX technology platform. Based on extensive scientific studies, DuPont sought approval of the manufacture and use of HFPO Dimer Acid as a fluoropolymer processing aid under the Toxic Substances Control Act. In January 2009, EPA issued a Consent Order approving DuPont's request. The Consent Order permitted DuPont to manufacture and use HFPO Dimer Acid subject to certain

3

restrictions, including a requirement that DuPont complete and submit additional studies, which DuPont did.

**2.**    The Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, was established to ensure the quality of drinking water in the United States. To protect drinking water, it authorizes EPA to establish national standards based on a detailed risk-and-cost assessment and the best available peer-reviewed science. Generally, all owners or operators of public water systems must comply with those standards. *Id.* §§ 300f(5), 300g.

But EPA did *not* use this rigorous regulatory process to establish a drinking water standard for HFPO Dimer Acid. Rather, EPA invoked a separate authority to "publish health advisories (which are not regulations) or take other appropriate actions for contaminants not subject to any national primary drinking water regulation." *Id.* § 300g-1(b)(1)(F).

On June 15, 2022, EPA issued a Final Drinking Water Health Advisory entitled *Hexafluoropropylene Oxide (HFPO) Dimer Acid (CASRN 13252-13-6) and HFPO Dimer Acid Ammonium Salt (CASRN 62037-80-3), Also Known As "GenX Chemicals."* This Health Advisory sets forth a level for HFPO Dimer Acid in drinking water of 10 parts per trillion. That level is more than an order of magnitude below prior EPA conclusions on the toxicity of

4

HFPO Dimer Acid. As set forth below and in other pleadings, this new EPA level is based neither on sound science nor on proper procedures.

In issuing the Health Advisory, EPA relied on a Toxicity Assessment it had released in 2021, which itself had dramatically changed the results of a 2018 Toxicity Assessment by the same agency. In issuing the 2021 Toxicity Assessment, EPA (among other things):

(i) relied upon toxicological effects in rodents that are irrelevant to humans;

(ii) speculated, incorrectly, about other "modes of action" that would be relevant to humans but failed even to identify, much less evaluate, a critically important peer-reviewed study published on precisely this subject;

(iii) invented an unprecedented toxicological concept—a so-called "constellation" of effects—to justify its conclusion; and

(iv) used significantly inflated "uncertainty factors," contradicting its own guidance and practice.

The Health Advisory compounded those *scientific* errors with *administrative-process* errors. Among other things, EPA failed to consider the substantial costs to the American economy and other likely consequences of its action.

3.      On July 13, 2022, Chemours filed a Petition for Review of Agency Order, Doc. 1-1, seeking review of the Health Advisory. In this Petition, Chemours intends to show that the Health Advisory is arbitrary and capricious and otherwise inconsistent with the law. The Petition explains that, in adopting the Health Advisory, EPA: (i) incorporated toxicity assumptions that dramatically deviate from its own standard methods—so much so that EPA's own peer reviewer called aspects of EPA's toxicity assessment "extreme" and "excessive"; and (ii) incorporated grossly incorrect and overstated exposure assumptions. The Health Advisory also violates basic requirements of due process and administrative procedure because the agency failed to submit its Health Advisory for public notice and comment; failed to consider the costs and benefits of its actions; and failed to take into account the major consequences of its actions on the broader American economy.

On December 6, 2022, this Court denied Respondents' motion to dismiss Chemours's Petition. Doc. 30.

## B.    Movants' Factual Assertions Are Inaccurate, Incomplete, and Irrelevant

Notwithstanding that the Respondents in this proceeding are fully capable of defending the agency action at issue, Movants seek to intervene in this suit. Chemours opposes the motion because, as explained below,

Respondents are fully capable of adequately defending their own actions, and their interests align with those of Movants.

Before addressing that *legal* issue, however, there are two *factual* points worth noting. Movants' motion, and the extensive declarations attached to it, include a number of factual assertions that go far beyond the relevant issues. While many of these assertions are inaccurate, misleading, or incomplete, Chemours will not attempt to respond to them here, other than to make the following points.

***First***, Movants assert (at 17-18) that the Health Advisory has significant ramifications for them because it affects Chemours's obligations under a 2019 Consent Order with the North Carolina Department of Environmental Quality and one of Movants (Cape Fear River Watch). *See* Consent Order, Doc. 9-2 at MA-42-87. Paragraph 19 of the Consent Order requires Chemours to provide certain types of replacement drinking water to users of private wells whose water is found to have HFPO Dimer Acid "in exceedance of" 140 parts per trillion—the health goal set by the State—or "any applicable health advisory." *Id.* at MA-65. Movants thus imply that well users with concentrations between the Health Advisory level (10 parts per trillion) and the North Carolina level (140 parts per trillion) can now get replacement drinking water supplies

*because of* the Health Advisory, but could not get replacement supplies otherwise.

That is incorrect. In the very next paragraph, the Consent Order states that Chemours agrees to "provide for and properly maintain permanent replacement water supplies through the installation of three under sink reverse osmosis drinking water systems approved by [the N.C. Department of Environmental Quality] for any party (i.e., household, business, school, or public building) that does not qualify for permanent replacement of a private drinking water supply pursuant to paragraph 19 with a drinking water supply well contaminated by" concentrations of GenX compounds (among others) "in exceedance of" 10 parts per trillion. *Id.* at MA-66. This means that any private well that has HFPO Dimer Acid above 10 parts per trillion was *already* entitled to a replacement drinking water supply approved by North Carolina—and will continue to be so entitled, regardless of what this Court does with the Health Advisory.[1]

**Second**, Movants' motion is replete with suggestions that there is a public health crisis in areas that draw drinking water from the Cape Fear

---

[1] As Movants' own papers make clear, Chemours has undertaken to provide replacement water consistent with the Health Advisory, while reserving its rights based on this proceeding. *See* Sussman Decl. Ex. 4, Doc. 9-2 at MA-94.

River watershed, near Chemours's manufacturing facility in Fayetteville, North Carolina. *See, e.g.*, Donavan Decl. ¶ 3, Doc. 9-2 at MA-4 (communities "have been devastated by PFAS contamination"); Watters Decl. ¶ 9, Doc. 9-2 at MA-129 ("We see known PFAS related health issues"); Stewart Decl. ¶ 8, Doc. 9-2 at MA-34 (similar). This is not true. Movants do not—and cannot— claim to identify *any* evidence showing a public health effect from exposure to HFPO Dimer Acid. Even the Health Advisory did not cite any epidemiological data. In fact, there are *no* epidemiological data showing an increased risk of cancers attributable to exposure to HFPO Dimer Acid, including in the counties surrounding the Fayetteville facility.

Epidemiological evidence actually points the other way. In 2017, the N.C. Department of Health and Human Services analyzed data from the State's Central Cancer Registry and found no trends of increased cancer risk in the counties with water allegedly impacted by HFPO Dimer Acid originating from the Fayetteville facility. In fact, the Department concluded that rates of cancers are generally *lower* in counties with exposures to HFPO Dimer Acid than the rates reported in counties without alleged exposure; than in North Carolina generally; and than in the U.S. general population. According to the Department, "the results do not point to any consistent

trends in counties that get their water from the lower Cape Fear. 'Overall the results are what we would expect to see looking at multiple types of cancer in multiple counties, with some rates below and above the state rate.'"[2]

Other epidemiological evidence is consistent with this conclusion. For example, a study from March 2022 looked at multiple data sources–including epidemiological data from the North Carolina Department of Health and Human Services, the U.S. National Cancer Institute, and the Centers for Disease Control and Prevention—and concluded that "these data sources do not support an adverse effect of HFPO-DA on cancer or liver disease in humans."[3]

## LEGAL STANDARD

A request to intervene in proceedings to review agency action is governed by Federal Rule of Appellate Procedure 15(d). Because the rule itself does not articulate a standard for evaluating an intervention motion, courts look to "the policies underlying intervention in the district courts, including the legal 'interest' that a party seeks to 'protect' through

---

[2] Press Release, N.C. Dep't of Health & Hum. Servs., *N.C. DHHS Releases Summary of Selected Cancer Rates for Counties in Cape Fear Region* (June 29, 2017), https://www.ncdhhs.gov/news/press-releases/2017/06/29/nc-dhhs-releases-summary-selected-cancer-rates-counties-cape-fear-region.

[3] Ellen T. Chang, Exponent, *Epidemiology of Hexafluoropylene Oxide Dimer Acid and Its Ammonium Salt* (Mar. 15, 2022), https://tinyurl.com/2mtub5ke (Ex. 5 at p.2).

intervention." *Cameron v. EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1010 (2022) (quoting Fed. R. Civ. Proc. 24(a)(2)) (citation and quotation marks omitted). Cases interpreting and applying Federal Rule of Civil Procedure 24, which governs district court intervention, are therefore instructive.

Under Rule 24(a), a proposed intervenor as of right has the burden to establish that: (1) it has a significantly protectable interest in the lawsuit; (2) its interest may be impaired by the disposition of the lawsuit; and (3) its asserted interest is not adequately represented by the existing parties to the litigation. Fed. R. Civ. P. 24(a)(2); *see Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57-58 (3d Cir. 2018). This Court has also made clear that only certain "interests" can justify intervention: "Due regard for efficient conduct of the litigation requires that intervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought. The interest may not be remote or attenuated." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998).

## ARGUMENT

Movants' request for intervention does not satisfy Rule 24(a)'s requirements. Movants have not identified any interest that is specific to them,

nor any argument or legal position that they would advance but Respondents would not. Insofar as Movants wish to offer their own "perspective" on the agency action being challenged in this suit, Movants' Br. 22, they can do so as *amici curiae*.

### A. Movants Do Not Have a Significantly Protectable Interest in EPA's Health Advisory

Under Rule 24(a)(2), a proposed intervenor must have "an interest relating to the property or transaction that is the subject of the action." But not just *any* interest will suffice; the interest must be "significantly protectable," *Donaldson v. United States*, 400 U.S. 517, 531 (1971), which this Circuit has interpreted to mean "a cognizable legal interest, and not simply an interest of a general and indefinite character," *Pennsylvania*, 888 F.3d at 58 (quoting *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1116 (3d Cir. 1992)). "An applicant must therefore demonstrate that its interest is 'specific to it, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.'" *Id.* (quoting *Kleissler*, 157 F.3d at 972) (brackets omitted). And of particular relevance here, "the mere fact that a lawsuit may impede a third party's ability" to obtain relief "in a separate suit ordinarily does not give the third party a right to intervene." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 221 (3d Cir. 2005) (quoting *Mountain Top*

*Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995)). Movants have not identified such an interest in this suit.

**First**, Movants' asserted interest in "defending the GenX Health Advisory" against legal challenge, Movants' Br. at 15, is insufficiently distinctive to them. Movants claim (at 16) a generalized interest in "preventing harmful exposure to contaminated drinking water." But they share that interest not only with EPA and its Administrator—the proper respondents in this agency-review Petition—but also with all other members of the public. Nothing about that interest is "specific to [Movants]" in particular.

Even if the relevant universe were artificially limited to those "in North Carolina [who] receive drinking water" with potential exposure to HFPO Dimer Acid from Chemours's Fayetteville plant, Movants' Br. 16, that category of similarly situated persons is still very large: Movants themselves note that "nearly 500,000 residents of Southeastern North Carolina" potentially draw their drinking water from the Cape Fear River watershed. Donovan Decl. ¶ 2, Doc. 9-2 at MA-4. If Movants were entitled to intervene in this lawsuit, so too would every one of those half-million residents (or any group representing them). But this Circuit has repeatedly rejected such "general" interests—shared by so many—as insufficiently specific and thus

not "legally cognizable" under Rule 24(a). *Liberty Mut.*, 419 F.3d at 220 (quoting *Mountain Top*, 72 F.3d at 366); *see, e.g.*, *Athens Lumber Co. v. FEC*, 690 F.2d 1364, 1366 (11th Cir. 1982) ("[The union intervenor's] alleged interest is shared with all unions and all citizens concerned about the ramifications of direct corporate expenditures. Because this interest is so generalized it will not support a claim for intervention of right.").

**Second**, Movants note (at 16-17) that "EPA health advisories . . . inform local and state regulators," who then "rely on [the advisories] in implementing their own drinking water protection programs." That interest is, by definition, not theirs to assert. But even if it were, that asserted interest is even *more* generalized: *All* states and territories (except Wyoming and the District of Columbia) have primary enforcement responsibility under the Safe Drinking Water Act for their own drinking water programs. *See* EPA, *Public Water System Supervision (PWSS) Grant Program*.[4] More than 300 million American are thus subject to "drinking water protection programs" adopted by "local and state regulators."

Moreover, Movants' asserted interest in the *information* provided by the HFPO Dimer Health Advisory is entirely disconnected from this dispute

---

[4] https://www.epa.gov/dwreginfo/public-water-system-supervision-pwss-grant-program.

over the advisory's *legal validity*. Nothing that happens in this suit will impair the ability of regulators, Movants, or other members of the public "to make decisions to protect their health and inform the public of the risks of drinking water contaminants," including based on information in the Health Advisory. Movants' Br. 16. The advisory has already been released publicly and is available on EPA's website.[5] Even if this Court sets it aside, that would not affect Movants' ability "to advocate for further measures in North Carolina and elsewhere to lower GenX . . . levels in public water systems" or their ability to advocate based on the advisory's "technical information." *Id.* at 17. Movants' informational interest in the Health Advisory would thus not be "directly affected in a substantially concrete fashion by the relief sought." *Pennsylvania*, 888 F.3d at 58 (citation omitted).

Any interest that Movants might have in the Health Advisory's *persuasive value*, moreover, depends on the case's merits. Movants see value in the advisory as an advocacy tool *because* they believe it to be based on the "best available science." Movants' Br. 16. Yet whether the Health Advisory is indeed based on the best available science, as the Safe Drinking Water Act requires, is a contested merits question that this Court will resolve. Movants'

---

[5] https://www.epa.gov/system/files/documents/2022-06/drinking-water-genx-2022.pdf.

reasoning accordingly "begs the question to be decided in the litigation and thereby confuses the merits of the litigation with the standard for intervention under Rule 24(a)(2)." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 800 (2d Cir. 2022).

***Third***, Movants invoke a "Consent Order settling litigation against Chemours" under which Chemours, the N.C. Department of Environmental Quality, and one of Movants (Cape Fear River Watch) have agreed that Chemours will provide "alternative drinking water for those private wells with GenX contamination exceeding the GenX Health Advisory level" of 10 parts per trillion. Movants' Br. 17-18 (quoting Sussman Decl. Ex. 2 (NCDEQ Press Release), Doc. 9-2 at MA-89). Yet again, however, Movants fail to identify an interest *specific* to them. The Consent Order was signed by the State of North Carolina, and it resolves claims under North Carolina law. *See* Consent Order, Doc. 9-2 at MA-46-47. Movants' asserted interest in enforcement of the Consent Order's drinking water provisions is accordingly shared with every "household, business, school, or public building" in the areas alleged to be affected by the circumstances addressed by the Consent Order.

Movants' attempt to rely on the Consent Order also fails on its own terms. Chemours's agreement that it will provide "permanent replacement

water supplies" for private well-users is *not* dependent on the Health Advisory. *Id.* ¶ 19, Doc. 9-2 at MA-66; *see supra* p. 9. Movants note that Paragraph 19 of the Consent Order requires Chemours to offer replacement supplies to those "with a private drinking water well that has been found through testing validated by [the Department of Environmental Quality] to be contaminated by concentrations of GenX compounds in exceedance of 140 [parts per trillion], or any applicable health advisory, whichever is lower." *Id.* ¶ 19 at MA-65. But the Consent Order *also* independently provides that Chemours will install and maintain "three under sink reverse osmosis drinking water systems approved by [the Department of Environmental Quality] for any party . . . that does not qualify for permanent replacement of a private drinking water supply pursuant to paragraph 19 with a drinking water supply well contaminated by" concentrations of GenX compounds (including HFPO Dimer Acid) "in exceedance of" 10 parts per trillion. *Id.* ¶ 20 at MA-66. Consistent with this commitment, Chemours has provided and will continue to provide replacement water supplies approved by the State for users of wells with HFPO Dimer Acid concentrations above 10 parts per trillion, regardless whether the Health Advisory is ultimately invalidated. Movants do not claim otherwise.

**B.    Denying Movants' Motion Will Not Impair Their Interests**

As demonstrated above, Movants cannot show that they have any protectable interest in this lawsuit, which alone is sufficient basis to deny the motion. "Where no protectable interest is present, there can be no impairment of the ability to protect it." *Am. Ass'n of People with Disabilities v. Herrera*, 257 F.R.D. 236, 252 (D.N.M. 2008); *see Brody*, 957 F.2d at 1123.

Additionally, the impairment inquiry requires putative intervenors to identify the "practical consequences of denying intervention." *Clean Earth, Inc. v. Endurance Am. Ins.*, No. 15-cv-6111, 2016 WL 5422063, at *4 (D.N.J. Sept. 28, 2016) (quotation marks omitted). Movants offer no practical consequences that would flow from their inability to participate as parties. As noted, a legal ruling invalidating the Health Advisory would not affect its public availability or the ability of state and local officials to consult it, *but see* Movants' Br. 19 (speculating that invalidation of the Health Advisory *might* cause "state and local authorities and drinking water utilities" to be "less willing" to rely on information contained there); nor would such a ruling relieve Chemours from its obligations under the Consent Order to provide permanent replacement water supplies for well-users, *but see id.* at 20 (speculating that Chemours "*may* refuse to provide alternative water supplies to well owners

with GenX contamination above 10 ppt if this Court invalidates the EPA Health Advisory") (emphasis added).

Finally, denying Movants' motion would not affect the arguments and evidence available for this Court's consideration. Whether or not Movants participate as parties, precisely the same arguments will be made in defense of the Health Advisory by the Justice Department. Indeed, because this Petition seeks review of agency action—the legality of which turns on "the validity of the grounds upon which the [agency] itself based its action," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)—relevant administrative-law principles *prohibit* the Court from considering arguments or evidence not relied upon by the agency itself. *See* Part I.C, *infra*.

Nevertheless, Chemours would not object to Movants participating in this lawsuit as *amici curiae*, which would ensure that their views are put before the Court, thereby alleviating any conceivable risk to their purported interests. *See Ohio Valley Env't Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 26 (S.D. W. Va. 2015) ("[T]he impairment prong is not met if the would-be intervenor could adequately protect its interests in the action by participating as amicus curiae.").

## C.    The Government Adequately Represents Movants' Interests

Even if Movants had a cognizable legal interest that could be impaired by this litigation, they cannot overcome the strong presumption that EPA and its Administrator, represented in this litigation by the Department of Justice, will adequately defend Movants' interest in preserving the legality of the Health Advisory. "Where official policies and practices are challenged, it seems unlikely that anyone could be better situated to defend than the governmental department involved and its officers." *Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3d Cir. 1976). This Circuit has thus consistently reaffirmed that "[a] government entity charged by law with representing a national policy is *presumed adequate* for the task, particularly when the concerns of the proposed intervenor . . . closely parallel those of the public agency." *Kleissler*, 157 F.3d at 972 (emphasis added). In such cases, the "would-be intervenor [must make] a *strong showing* of inadequate representation." *Id.* (citation omitted). Movants have not made such a showing here.[6]

Movants rely (at 21) on *Kleissler* for the proposition that a presumption of adequacy is inappropriate where "an agency's views are necessarily colored

---

[6] The Supreme Court has held that the "presumption of adequate representation" does not apply "when a duly authorized state agent seeks to intervene to defend a state law." *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2204 (2022). That limitation has no relevance here.

by its view of the public welfare rather than the more parochial views of a proposed intervenor." 157 F.3d at 972. But the contrast with *Kleissler* only underscores why intervention is inappropriate here. In *Kleissler*, the proposed intervenors' financial interests *conflicted* with the "thicket of sometimes inconsistent [Forest Service] policies" that the government was defending, casting "reasonable doubt [on] whether the government agency would adequately represent [intervenors'] concerns." *Id.* at 974, 967; *see United States v. Territory of Virgin Islands*, 748 F.3d 514, 522 (3d Cir. 2014) (*Kleissler* involved an actual "conflict," since "intervenors' financial interests" were "in tension with those of the government"). An actual conflict was also present in other cases on which Movants rely. *See Fund for Animals Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) (presumption of adequate representation inappropriate where agency's "obligation is to represent the interests of the American people," while intervenor's "concern is for Mongolia's people and natural resources"); *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986) (intervenor had "financial interest" that was "not shared by the citizens of the District of Columbia," such that "the District government would face a potential conflict of interest were it to represent both the general interests of its citizens and [intervenor's] financial interests").

Movants have provided no reason why the U.S. Department of Justice would be inadequate to the task of representing EPA here. Movants do not identify any position they intend to take—or argument they intend to make—that differs from those of EPA. To the contrary, Movants and the government are perfectly aligned in their view that EPA's Health Advisory was lawfully issued and adequately supported such that it should not be "overturned." Movants' Br. 5. Courts are particularly reluctant to grant party status where a proposed intervenor "share[s] the same objective as the United States." *United States v. City of Los Angeles*, 288 F.3d 391, 402 (9th Cir. 2002).

Movants nevertheless speculate regarding possible reasons that "EPA *may* not adequately represent Movants' interests," Movants' Br. 22 (emphasis added), but none is persuasive. Movants assert (at 22) that their interests in preserving the Health Advisory as "a critical source of information," and in using it to obtain benefits for private well-owners under the Consent Order, are merely "'parochial' interests" that EPA does not share. Yet the fact that Movants are a subset of the public, who intend to benefit from the Health Advisory in their own particular way, is insufficient: *Every* private party seeking to intervene on the government's side has an interest that is "parochial" in that sense. *See Territory of Virgin Islands*, 748 F.3d at 523

("The mere fact that [the would-be intervenor] is but one individual while the United States is seeking systemic change . . . is not relevant under the facts of this case, since their interests are not in conflict."). What matters is that Movants' objective—to defend the Health Advisory—and their arguments in support of that objective are exactly the same as the government's.

Movants speculate (at 22) that they and EPA "may also have different perspectives on the state of the science underlying" the Health Advisory. *See* Movants Br. 23 ("[I]t is *possible* that EPA may characterize the data on GenX chemicals differently from Movants.") (emphasis added). That speculation—in addition to being insufficiently concrete to overcome the strong presumption of adequate governmental representation—is irrelevant: In a challenge to agency action, courts must "confin[e] [their] review to a judgment upon the validity of the grounds upon which the [agency] itself based its action." *Chenery*, 318 U.S. at 88. That means the Health Advisory's legality must stand or fall based on *the agency's* "contemporaneous explanations," not "justifications belatedly advanced by" third-parties like Movants. *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).

In sum, at this stage of the proceedings, there is nothing to indicate that the government's interests in defending the Health Advisory differ in any

relevant respect from Movants' interests in achieving the same end. Movants speculate (at 23) that some future change of agency policy could eventually give rise to a "divergence of interests over time." In the unlikely event that such a divergence develops, Movants would be free to seek intervention at that time. *See, e.g.*, *Karcher v. May*, 484 U.S. 72, 75, 81-82 (1987) (authorizing incumbent legislators to intervene in defense of the constitutionality of state law after the attorney general declined to do so); *Maine v. U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 17-21 (1st Cir. 2001) (upholding denial of intervention but directing district court to "revisit" the issue "[s]hould it appear to the district court from some event that the government may not be adequately representing" proposed intervenors' interest). But so long as their interests remain fully aligned with EPA's, Movants are not entitled to intervene.[7]

## CONCLUSION

The Court should deny the motion to intervene.

---

[7] Movants again invoke *Kleissler* for the proposition that "it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts." 157 F.3d at 974. But *Kleissler* did not hold that the mere *possibility* of a policy shift is itself sufficient—a proposition that would allow intervention in *all* challenges to agency programs. Rather, the agency's own interests were "complex and conflicting," and the agency had *already* "chose[n] not to appeal an adverse ruling" in a related case. *Id.* at 973. Here, EPA's interest in defending its Health Advisory is straightforward, and there is no reason to doubt it will do so.

Date: December 16, 2022          Respectfully submitted,

_____

Allon Kedem
Brian D. Israel
Joel M. Gross
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
Fax: (202) 942-5999

*Counsel for The Chemours Company FC, LLC*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

Dated: December 16, 2022

Allon S. Kedem

# CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 16, 2022

_____
Allon Kedem

## CERTIFICATE OF COMPLIANCE

1.    The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because the brief contains 5,048 words.

2.    The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century 14-point font.

3.    In accordance with Third Circuit Local Appellate Rule 31.1(c), Petitioner's Brief, as electronically filed on December 16, 2022, was scanned with a virus detection program, namely Microsoft Defender (Version 1.371.607.0), and no virus was detected.

Dated: December 16, 2022

Allon Kedem