No. 22-2287

# In the United States Court of Appeals for the Third Circuit

THE CHEMOURS COMPANY FC, LLC,
*Petitioner,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, in his official capacity as Administrator
of the United States Environmental Protection Agency,
*Respondents.*

On Petition for Review of Agency Order

**PETITIONER'S FINAL REPLY BRIEF**

Allon Kedem
Brian D. Israel
Joel M. Gross
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
allon.kedem@arnoldporter.com

*Counsel for The Chemours Company FC, LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................2

I.      This Court Has Jurisdiction................................................2

        A.      The Health Advisory Is Final Agency Action .................2

        B.      Chemours Has Standing to Challenge the Health Advisory.......16

II.     EPA Was Required to Submit the Health Advisory for Public Notice and Comment ..................................................18

III.    The Health Advisory Is Substantively Unlawful....................20

        A.      EPA's Exposure Assumption Exceeds Its SDWA Authority .......................................................20

        B.      EPA Failed to Justify Its Exposure Assumption .........................24

        C.      EPA Relied on Unsupported Toxicity Assumptions ....................26

        D.      EPA's Failure to Consider Costs Is Unlawful .............................29

IV.     The SDWA Inadequately Constrains EPA's Authority.........................31

CONCLUSION ................................................................................33

CERTIFICATE OF SERVICE....................................................34

CERTIFICATE OF COMPLIANCE................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Waterways Operators v. Wheeler,*
   507 F. Supp. 3d 47 (D.D.C. 2020) ......................................................31

*Bennett v. Spear,*
   520 U.S. 154 (1997).........................................6, 7, 11, 12, 15, 18, 20, 32

*Cal. Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019)...........................................12, 13, 19, 20

*Chehazeh v. Att'y Gen.,*
   666 F.3d 118 (3d Cir. 2012) ............................................................15

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ..............................................................17, 18

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.,*
   637 F.3d 259 (4th Cir. 2011)..........................................................5, 6, 12

*Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA,*
   313 F.3d 852 (4th Cir. 2002).............................................................13

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022) ........................................................24

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
   805 F.2d 1050 (D.C. Cir. 1986)..........................................................25

*Gundy v. United States,*
   139 S. Ct. 2116 (2019) .................................................................32

*Hindes v. FDIC,*
   137 F.3d 148 (3d Cir. 1998) ............................................................13

*Indus. Safety Equip. Ass'n, Inc. v. EPA,*
   837 F.2d 1115 (D.C. Cir. 1988).........................................................19

ii

*INS v. Chadha,*
462 U.S. 919 (1983)..........................................................32

*Kleissler v. U.S. Forest Service,*
157 F.3d 964 (3d Cir. 1998) ........................................14

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007)......................................................18

*MetLife, Inc. v. Fin. Stability Oversight Council,*
177 F. Supp. 3d 219 (D.D.C. 2016) ........................30, 31

*Michigan v. EPA,*
576 U.S. 743 (2015)..................................................30, 31

*Minard Run Oil Co. v. U.S. Forest Serv.,*
670 F.3d 236 (3d Cir. 2011) ....................................15, 16

*Nat'l Wildlife Fed'n v. EPA,*
980 F.2d 765 (D.C. Cir. 1992)........................................9

*Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006)........................................16

*Ocean County Landfill Corp. v. EPA,*
631 F.3d 652 (3d Cir. 2011) ........................................14

*Ohio v. Dep't of Interior,*
880 F.2d 432 (D.C. Cir. 1989)......................................22

*Philadelphia v. Att'y Gen.,*
916 F.3d 276 (3d Cir. 2019) ........................................21

*Rhea Lana, Inc. v. Dep't of Labor,*
824 F.3d 1023 (D.C. Cir. 2016)................................11, 15

*Sackett v. EPA,*
566 U.S. 120 (2012).....................................3, 4, 5, 7, 20

*Townes v. City of New York,*
176 F.3d 138 (2d Cir. 1999) ........................................14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016)...................................................11

*W.R. Grace & Co. v. EPA*,
   261 F.3d 330 (3d Cir. 2001) ...........................................3

*Whitman v. American Trucking Associations, Inc.*,
   531 U.S. 457 (2001)...................................................30

**Statutes**

5 U.S.C.
   § 551(4) ...............................................................19

42 U.S.C.
   § 300f(6)...............................................................21
   § 300g-1(b)(1)(F)...........................................7, 21, 30
   § 300g-1(b)(3)(A)(i)......................................21, 22, 27
   § 300g-1(b)(3)(A)(ii)...................................................26
   § 300g-1(b)(3)(B)......................................................30
   § 300g-1(b)(13)(B)(i)..................................................22
   § 300g-1(d)........................................................8, 20
   § 300g-2(b)(1)...........................................................9
   § 300h-1(b)(3)...........................................................8
   § 300h-1(d)..............................................................8
   § 300h-2(a)(1)...........................................................8
   § 300h-2(b)..............................................................9
   § 300i(a)(2).............................................................4
   § 300j-7(a)(2)..........................................................5
   § 7412(n)(1)(A)........................................................30
   § 9621(d)(2)(A)(ii)......................................................8

71 Pa. Stat. & Cons. Stat. Ann. § 733-504(A) ...................13

N.C. Gen. Stat. Ann. § 143-215.2A(a)............................17

N.H. Rev. Stat. Ann. § 485-C:6(I) ..............................10

W. Va. Code Ann. § 22-11C-3(a) .................................10

## Regulations

40 C.F.R. § 145.31................................................................9

40 C.F.R. § 145.32................................................................9

40 C.F.R. § 300.5................................................................10

88 Fed. Reg. 18638 (Mar. 29, 2023)......................................16

## Other Authorities

Restatement (Second) of Torts § 442 (2022)........................14

# INTRODUCTION

When EPA issued the Health Advisory, the 10 parts per trillion health advisory level for HFPO Dimer Acid was automatically incorporated into substantive standards under a series of interlocking state and federal authorities; and agency officials gained new powers over the chemical's presence in excess of the EPA-set level. The Governments seeks to persuade the Court that EPA is a passive observer in these developments. But no court has ever shielded from judicial review an agency so deeply involved in decision-making that generated federal consequences like these.

Judicial review here is critically important, as EPA's procedural and substantive errors—including the agency's failure to observe the limits of its own statutory authority—compounded throughout its decision-making process. The agency's admitted failures to observe notice-and-comment requirements and to consider costs require vacatur in themselves. Contrary to what the Government says, EPA is explicitly not permitted to ignore scientific data simply because the data is unpublished. And EPA's repeated decisions to ratchet down the health advisory level, regardless of the actual evidence, was egregious even by administrative-law standards. This Court

should ensure basic guardrails for EPA's decision-making and safeguard the public's right to a transparent, science-based process.

## ARGUMENT

### I. THIS COURT HAS JURISDICTION

#### A. The Health Advisory Is Final Agency Action

The Government argues (at 17) that the Health Advisory "lacks direct and appreciable legal consequences" but fails to identify a single case in which agency action was deemed nonfinal despite comparable effects.

##### 1. The Health Advisory generates federal consequences

The Government *still* has failed "to identify 'any case where agency action had consequences under federal law and yet was not considered final and reviewable.'" Chemours Br. 28 (quoting ECF No. 25-1, 17).

**a.** The presence of a contaminant in excess of a health advisory level directly unlocks federal authority. The Government acknowledges (at 19) that "EPA may *consider* the science developed in health advisories where relevant in other proceedings." In fact, per its own guidance, EPA *must* consider health advisories: under the SDWA, when exercising emergency authority (Chemours Br. 26-27); and under CERCLA, when enforcing "applicable or relevant and appropriate requirements" (*id.* at 29-30), or when imposing

cleanup standards based on "to be considered materials" (*id.* at 30-31). And as Chemours noted without contradiction (Chemours Br. 27), a contaminant's presence in excess of a health advisory level is *sufficient* in practice to trigger federal authority: "there is no circumstance in which contaminant levels would exceed a health advisory, yet EPA would regard itself as unable to exercise its emergency powers."

The Government nevertheless dismisses those consequences (at 19) because "health advisories do not *predetermine* any issue or otherwise constrain EPA's discretion." Instead, the Government argues (at 18-20) that advisories are "purely informational documents,"[1] and EPA must consider additional "factors" before taking action under the SDWA or CERCLA, meaning the agency merely reviews health advisories "*along with other information … on a case-by-case basis.*"

The Government previously made this argument—and lost. In *Sackett v. EPA*, 566 U.S. 120, 124-25 (2012), EPA sent landowners a letter opining that

---

[1] The Government points (at 18) to Chemours's statement—in an unrelated multiparty brief—that certain actors were not "bound to follow" health advisory levels. But Chemours did not suggest that health advisories have no legal effects. Similarly unpersuasive is the Government's reliance (at 18) on *W.R. Grace & Co. v. EPA*, 261 F.3d 330, 334 n.1 (3d Cir. 2001), to show that a health advisory "is 'not a legally enforceable Federal standard.'" This Court merely quoted EPA's *own characterization* in the background section of an opinion that did not address finality.

their lot contained navigable waters subject to the Clean Water Act and directing them to comply with the Act. The Government argued that the letter was nonfinal because it was not itself enforceable, but a preliminary step towards a possible enforcement proceeding. *Id.* at 129. The decision whether to initiate such a proceeding, the Government noted, would require "consideration of [additional] factors," and the letter "itself did not commit the agency to any particular view." *Sackett* Br. 26.

The Supreme Court disagreed, explaining that "the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction." 556 U.S. at 129. Since EPA had already rejected the landowners' request to overturn the letter, "the *next* step will either be taken by" the landowners "or will involve judicial, not administrative, deliberation (if the EPA brings an enforcement action)." *Id.*

So too here. Because EPA has rejected Chemours's administrative attempts to overturn the Health Advisory, the next step will either involve acquiescence by Chemours to the (unlawful) health advisory level, or the agency may seek to invoke its emergency authority under the SDWA— including its power to "commenc[e] a civil action for appropriate relief." 42 U.S.C. § 300i(a)(2). Although EPA "may still have to deliberate" and

consider additional factors before that ultimate step, the Health Advisory need not be "self-executing" to be challengeable. *Sackett*, 556 U.S. at 129.[2]

Other courts have similarly allowed litigants to challenge agency action that was merely "a single, integral step in any eventual [agency] decision." Gov. Br. 27, *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259 (4th Cir. 2011). In *Dow AgroSciences*, pesticide manufacturers challenged a "biological opinion" from the National Marine Fisheries Service, which opined that options under consideration by EPA were likely to "'jeopardize the continued existence'" of species protected by the Endangered Species Act. *Id.* at 261. EPA would then take the opinion "under advisement" when carrying out its responsibility to cancel pesticide registrations under a separate statute—the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). *Id.* The manufacturers sued the Service under the APA, alleging the Service had failed to comply with the requirement "that its [biological opinion] be based on the 'best scientific and commercial data available.'" *Id.* at 264.

---

[2] The Government notes (at 21) that future EPA decisions relying on the Health Advisory will "themselves [be] final and reviewable." That is irrelevant: Congress authorized judicial review of "*any* … final action of the [agency]," 42 U.S.C. § 300j-7(a)(2) (emphasis added), regardless whether the action may *also* play a role in future agency decisions that will generate additional consequences.

The Government argued that the biological opinion "does not create obligations," and the Service "does not have the authority to impose conditions or obligations on [pesticide] Registrants or users directly." Gov't Br. 29, *Dow AgroSciences*.[3] Any future pesticide-decision under FIFRA would require EPA to "independently" evaluate relevant legal criteria. *Id.* at 28. Once that happens, "there will be adequate review of the [opinion] by the court of appeals on review of any decision by EPA." *Id.* at 18.

The court of appeals disagreed, because "the [opinion] has immediate and independent legal consequences that cannot be changed on later review of the EPA's action on reregistration, even if the EPA relies on the [opinion]." 637 F.3d at 265. Although a biological opinion "does not create a legally binding prohibition, in reality the [opinion] has a powerful coercive effect." *Id.* at 266 (cleaned up). Because compliance with the opinion insulates officials from liability under the Endangered Species Act, EPA as a practical matter "would 'very rarely choose' to act contrary to the Fisheries Service's recommendation." *Id.* (quoting *Bennett*, 520 U.S. at 169).

---

[3] Given *Bennett v. Spear*, 520 U.S. 154 (1997), the Government did not dispute the biological opinion's legal effect but, relying on analogous arguments, claimed it was nonetheless unchallengeable under the APA's judicial-review provision. 637 F.3d at 264.

The Government here similarly argues (at 29, 21) that health advisories cannot become CERCLA clean-up standards "without independent decisionmaking at several steps," and that exercises of EPA's emergency authority under the SDWA "are themselves final and reviewable." But even if health advisories will not be "legally binding" in those future agency proceedings, as a practical matter, the agency "would very rarely choose to act contrary to" its own prior assessment. *Id.* at 265-66 (cleaned up).

Indeed, notwithstanding repeated assertions (at 20, 29) about how EPA exercises authority under the SDWA "on a case-by-case basis" and under CERCLA "on a site-by-site basis," the Government cannot point to a *single instance* in which the agency has chosen, in either context, not to adopt a promulgated health advisory level. By contrast, Chemours has pointed to repeated instances where health advisories have been incorporated into substantive federal standards—not merely for the information they contain, but as "'Health Advisories' *qua* health advisories." Chemours Br. 31 & n.8 (providing examples).[4]

---

[4] The Government argues that "Congress clearly expressed its view that [health advisories] impose no obligations" because the SDWA says they "'are not regulations.'" Gov't Br. 17 (quoting 42 U.S.C. § 300g-1(b)(1)(F)). But non-regulatory agency action is routinely challengeable, as in *Sackett* (letter) and *Bennett* (biological opinion).

**b.**     Federal consequences also result from the incorporation of health advisories by States invested with federal authority to enforce state-law standards. Under the SDWA, EPA may grant "primary enforcement responsibility" to a State by approving its underground injection control (UIC) program. 42 U.S.C. § 300h-1(b)(3). And under CERCLA, state standards are "applicable or relevant and appropriate … requirements" (ARARs) for on-site remedial actions. *Id.* § 9621(d)(2)(A)(ii). These federal regimes invest substantive state standards with federal consequences.

The Government's assertion (at 27) that these are not "exercise[s] [of] *federal* power" is unpersuasive. Discussing Utah's UIC requirements, for instance, the Government says (at 27-28) that "the state's 'primary enforcement responsibility' [under the SDWA] simply obviates the need for EPA to prescribe a federal UIC program for the state." But granting Utah primacy "obviates the need" for EPA to set UIC standards precisely *because* the State's standards replace EPA-chosen standards as the governing law. The state standards are thus federal commands: They constitute *the* "applicable underground injection control program" for the State, 42 U.S.C. § 300h-1(d), to which "any person" within the State is "subject," including federal penalties for "violat[ing] such requirement[s]," *id.* § 300h-2(a)(1). If

"federal power" means anything, it surely refers to standards whose violation is forbidden by federal law and punishable by federal civil and criminal sanctions. *See id.* § 300h-2(b).

Further underscoring the federal nature of these UIC standards, EPA approval is a precondition for them to go into effect, 40 C.F.R. § 145.31, and EPA has "an ongoing obligation … to monitor each primacy state's conformity" with the SDWA. *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 771 (D.C. Cir. 1992). EPA also must "revis[e]" state standards as appropriate, 40 C.F.R. § 145.32, or withdraw primacy if standards no longer match statutory requirements, 42 U.S.C. § 300g-2(b)(1). The Government downplays EPA's involvement (at 27) because EPA is required to approve any state-generated UIC program that "meets the minimum requirements." But that does not make the standards any less federal. And as described below, the agency's supposed lack of "independent judgment" only makes the federal consequences *more* direct (pp. 13-15, *infra*).

With regard to ARARs, the Government does not dispute that they constitute exercises of federal power. Instead, it argues (at 28) that EPA-issued health advisories are "several steps removed" from enforceable site-remediation standards. But these "steps" are less than advertised.

The "first" step is for a state to "promulgate the advisory as part of a legally enforceable, more stringent state standard of general applicability." Gov't Br. 28. That step is easy enough: Almost half of States already have. Chemours Br. 32.[5]

The next step is for "the lead agency for the site [to] determine the state standard is either applicable to or relevant and appropriate for the proposed remedial action, and should not be waived." Gov't Br. 28-29. Also easy: The States themselves serve as "lead agenc[ies]," 40 C.F.R. § 300.5, and a substantive state requirement adopting a health advisory level for a particular contaminant is a "relevant and appropriate" standard for that same contaminant. In New Hampshire, for instance, statewide ambient groundwater-quality standards must be no less stringent than levels set by "health advisories [that] have been promulgated under the Federal [SDWA]." N.H. REV. STAT. ANN. § 485-C:6(I). The Government's argument depends on the bizarre proposition that even though groundwater may not exceed a health advisory level *anywhere* in New Hampshire, the State would permit higher levels at cleanup sites in particular.

---

[5] West Virginia recently became the twenty-third such State. W. Va. Code Ann. § 22-11C-3(a).

Lastly, the Government argues (at 29) that ARARs are given effect only when incorporated into "a final record of decision," but it fails to explain why—or even how—relevant standards selected as ARARs might *not* be incorporated. And even if the Government were "theoretically" correct that an on-point state standard could somehow escape a final record of decision, "in reality" that will "very rarely" be the case. *Bennett*, 520 U.S. at 169 (citation omitted). The Government still has offered no more than speculation for that possibility. *Cf. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016) (under Court's "'pragmatic' approach ... to finality," even "risk" of significant penalties suffices); *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016) ("possibility that the agency might not" initiate enforcement proceeding based on challenged order "did not rob the administrative order ... of its legal consequences").

### 2. The Government's arguments against finality are unpersuasive

The Government's other arguments for disregarding the federal consequences of its health advisories are unpersuasive.

***Consequences under other statutes***. The Government argues (at 22) that "to satisfy *Bennett*'s second prong, Chemours must identify legal consequences from the Advisory that are 'a result of the specific statutes and

regulations that govern' it." Br. 22. Chemours has: Under the SDWA, health advisories unlock EPA's emergency powers and are enforceable through UIC programs in States that have primacy.

More fundamentally, there is no specific-statute requirement for finality. *Bennett* says only that "the [challenged] action must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 178 (cleaned up). Nor can such limitation be discerned from the statutory phrase "final agency action." *Cf. Dow AgroSciences*, 637 F.3d at 268 (permitting pesticide manufacturers to challenge decision made under Endangered Species Act that caused unwanted consequences under FIFRA).

The supposed limitation comes from *California Communities*, but the Government misconstrues that decision. The EPA-issued memorandum there, which explained EPA's interpretation of the Clean Air Act, "d[id] not have a single direct and appreciable legal consequence" under *any* law. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019). There was no argument that the memo had effect through some law *other than* the Act. In referring to the "statutes and regulations that govern the action at issue," *id.* at 631, and to "specific regulatory context," *id.* at 638, the court was making a

different point: that legal regimes are "unique," and courts should resist "comparison[s]" to prior cases involving "facially similar" regimes. *Id.* at 631-32.

**Consequences under state law**. EPA argues (at 24) that consequences dependent on state law are insufficiently "direct" because they "flow from the independent decisions of state legislatures and regulators." But the Government relies solely on cases involving consequences that would flow, if at all, from a third-party's *discretionary* decision-making in the *future*.

In *Hindes v. FDIC*, 137 F.3d 148, 162-63 (3d Cir. 1998), after the FDIC issued a deficiency notice, the state regulator exercised his authority to appoint a receiver "whenever it shall appear to [the regulator] that" one was appropriate, 71 Pa. Stat. & Cons. Stat. Ann. § 733-504(A). The Court did not suggest that FDIC's conduct would have been non-final if it *automatically* triggered the bank's closure, via state law or otherwise.

In *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002), "GSA and other federal agencies [we]re free to embrace or disregard" the challenged agency report. Here, no such freedom exists; the relevant consequences result automatically by operation of law.

In *Ocean County Landfill Corp. v. EPA*, 631 F.3d 652, 655 (3d Cir. 2011), the state permitting agency was instructed by EPA to draft a permit but could "decline[] to address the EPA's objections" to the draft. There was accordingly "no way to know in advance whether the final permit that results from that process [would] incorporate" the challenged agency decision. *Id.* at 655-56. Here, it is easy to "know in advance" that state standards will incorporate the Health Advisory. They *must.*

The Government's cases are thus unlike this one, where consequences occur *automatically*, by operation of laws existing at the time of the agency's action.[6] Under "well settled" common-law principles, "the chain of causation … is broken by the intervening exercise of independent judgment" by a third-party. *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999); *see* Restatement (Second) of Torts § 442 (2022). But causation remains "direct" where an existing "state law commands" the result at the time the agency acts. *Kleissler v. U.S. Forest Service*, 157 F.3d 964, 973 (3d Cir. 1998).

The Government dismisses *Kleissler* (at 26), arguing that "[w]hat is sufficiently 'direct' for purposes of intervention is not necessarily 'direct'

---

[6] Contrary to Intervenors' assertion (at 28 n.9), every State in Chemours's appendix has at least one law automatically incorporating EPA health advisories into *mandatory* requirements.

enough for *Bennett*." But both share a common core: a "legally cognizable interest" threatened by the challenged conduct. *Id.* at 976 (Becker, C.J., concurring). The Government asserts (at 26) that the finality requirement is a "jurisdictional limitation" that "must be construed narrowly." That is wrong. *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 125 n.11 (3d Cir. 2012) (APA's final-agency-action requirement is *not* jurisdictional); Gov't Br. 16-17 (APA interpretations of "final action" apply under SDWA). But it is also irrelevant: The finality test is "pragmatic and flexible," *Rhea Lana*, 824 F.3d at 1027 (cleaned up), and the Government is not "constru[ing]" the SDWA's finality language anyway.

**Pragmatic Considerations.** The Government's argument (at 21) regarding "the 'pragmatic considerations' this Court weighs in finality cases" largely repeats arguments made elsewhere about whether the Health Advisory generates legal consequences (pp. 2-11, *supra*) and affects Chemours's operations (pp. 16-18, *infra*).

The remaining pragmatic considerations support review. The Health Advisory "represents the agency's definitive position on the question[s]" posed by Chemours's petition, which involves questions of law "that do[] not require further factual development." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670

15

F.3d 236, 249 (3d Cir. 2011) (citation omitted). Those questions include Chemours's constitutional and statutory-interpretation arguments. "Whether an agency decision is arbitrary and capricious," too, "is a purely legal question." *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006).

Chemours's challenge would also "speed enforcement of" the SDWA. *Minard Run*, 670 F.3d at 249. If Chemours wins its argument about relative source contribution here, it will avoid future conflict over that issue, including in the pending rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023). The Government's accusation (at 21-22) that "Chemours aims to hinder EPA's efforts to disseminate information about the health effects of HFPO-DA" is false. Chemours challenges already-disseminated information that it believes is flawed.

## B.  Chemours Has Standing to Challenge the Health Advisory

If *anyone* has standing to challenge the Health Advisory, it is Chemours—who, as successor to the EPA-approved manufacturer of HFPO Dimer Acid, manufactures and uses it at multiple facilities, ECF No. 25-2 (Telford Decl.) ¶¶ 4-5.[7]

---

[7] The Government notes (at 5 n.2) that "[t]he only previous challenge to a health advisory was dismissed for lack of standing," but omits that it was dismissed for lack of *associational* standing. Order, *Am. Chem. Council v. EPA*, No. 22-1177 (D.C. Cir. Jan. 23, 2023).

The Government's contrary argument (at 31-33) recycles its contention that the Advisory lacks direct consequences. The Government dismisses (at 32) consequences resulting from the "independent action" of States that incorporate EPA health advisories. But that ignores the federal authority directly unlocked by the presence of a contaminant in excess of an EPA health advisory (pp. 2-7, *supra*); and EPA's integral role in granting primacy to States that adopt health advisory levels, plus its ongoing role approving and enforcing those standards (p. 9, *supra*).

Even where a plaintiff's injury depends upon the decisions of truly independent third-parties, moreover, standing exists if the plaintiff can show "that third parties will likely react in predictable ways." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Here, the reactions of relevant third-parties (the States) are more than predictable: They are legally automatic.

In North Carolina, for instance, where Chemours manufactures HFPO Dimer Acid at its Fayetteville Works facility, Telford Decl. ¶ 5, the Health Advisory has given state officials new powers to order relief for an "exceedance of [the] health advisory level established by [EPA]." N.C. Gen. Stat. Ann. § 143-215.2A(a). The Government argues (at 32) that the N.C. statute merely authorizes the same relief that Chemours agreed to in the 2019

consent order; but the two differ, including because the consent order is limited to areas "surrounding" the Fayetteville facility. Telford Decl. ¶ 7.

The Government also notes (at 32-33) that enforcement actions are "discretionary" under *some* of these state laws (though only some). That hardly matters: A defendant's conduct need not be "the very last step in the chain of causation." *Bennett*, 520 U.S. at 169. Otherwise, pre-enforcement challenges would rarely be possible. Instead, the challenged conduct must create a "genuine threat of enforcement." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Chemours thus pointed to a recently issued National Pollutant Discharge Elimination System permit limiting discharges at the Fayetteville facility "based on the EPA drinking water health advisory." Telford Decl. ¶ 9 (citation omitted). The point is *not* that the permit "establish[es] standing" by itself. Gov't Br. 33. Rather, it illustrates the common-sense proposition that officials behave "predictabl[y]," *Dep't of Com.*, 139 S. Ct. at 2566, and the enforcement threat is hardly "speculative," *Bennett*, 520 U.S. at 167.

## II.    EPA WAS REQUIRED TO SUBMIT THE HEALTH ADVISORY FOR PUBLIC NOTICE AND COMMENT

Unable to dispute that EPA failed to submit the Health Advisory for notice and comment, the Government argues (at 34) that the Advisory either

is "not a 'rule' within the APA's definition" or else "falls within the notice-and-comment exemption for 'general statements of policy.'" Neither argument works. The appreciable consequences that establish the Health Advisory's finality also make it a "rule," 5 U.S.C. § 551(4), and disqualify it from being a "general statement of policy." Indeed, the Health Advisory is exceedingly specific: "EPA is issuing a lifetime noncancer drinking water Health Advisory (HA) for GenX chemicals of 10 nanograms per liter (ng/L) or 10 parts per trillion (ppt)." JA9.

If Chemours is right that this substantive standard has appreciable legal consequences, then it constitutes a legislative rule. In every case the Government cites, by contrast, the challenged agency action generated *no* legal consequences. *See, e.g.*, *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1120-21 (D.C. Cir. 1988) (agency-issued Guide not a "rule" because it altered no "legal requirements" for officials or "regulated industry"). Conversely, the Government identifies no case in which an agency pronouncement *was* "final agency action" but *was not* a legislative rule.

Citing *California Communities*, the Government argues (at 34 n.9) that "[t]he finality test does not subsume the test for legislative rules." But the Government ignores the D.C. Circuit's explanation for why that is. In certain

unusual circumstances, "interpretive rules can be final," and thus subject to judicial review, even if they are not legislative. 934 F.3d at 635-36. That theoretical possibility is irrelevant here: The Health Advisory is obviously not interpretive; it sets a specific numerical threshold.

Finally, the Government points out (at 35) that the SDWA says "health advisories are not regulations." But an APA "rule" need not be a "regulation," as numerous cases (*e.g.*, *Sackett*, *Bennett*) illustrate. While the Government emphasizes that the SDWA requires "[*r*]*egulations* under this section [to] be prescribed in accordance with section 553 of title 5 (related to rulemaking)," it omits the key phrase: "*except that* the Administrator shall provide opportunity for public hearing prior to promulgation of such regulations." 42 U.S.C. § 300g-1(d) (emphases added). Thus, for "[r]egulations," Congress imposed an *additional* procedural requirement ("public hearing") beyond what the APA normally prescribes. For *non*-regulations, by contrast, EPA must comply with the default notice-and-comment rules—but failed to do so here.

## III. THE HEALTH ADVISORY IS SUBSTANTIVELY UNLAWFUL

### A. EPA's Exposure Assumption Exceeds Its SDWA Authority

Key statutory text expressly limits EPA's authority to identifying appropriate levels for contaminants *in drinking water*. The agency may issue health advisories only as "appropriate" to protect the public from

"contaminants," 42 U.S.C. § 300g-1(b)(1)(F), and a "contaminant" is limited to a "substance or matter *in water*," *id.* § 300f(6) (emphasis added).

Remarkably, the Government makes no attempt to construe those provisions or explain how they could be read as authorizing EPA to account for the presence of contaminants *not* "in water." That textual failure is dispositive, since an agency "literally has no power to act unless and until Congress confers power upon it." *Philadelphia v. Att'y Gen.*, 916 F.3d 276, 284 (3d Cir. 2019) (cleaned up). But insofar as the Court deems it necessary to consider other textual clues, they strongly reinforce the primary language. Chemours Br. 39-40, 42-45.

In response, the Government points (at 43-44) to an ancillary provision that requires EPA to consider "the best available, peer-reviewed science and supporting studies." 42 U.S.C. § 300g-1(b)(3)(A)(i). The Government's reliance on this provision fails.

For one thing, the notion that Congress implicitly hid authority for EPA over unmentioned, non-water sources of exposure in a provision that merely requires consideration of the "best available, peer reviewed science" is baseless. Using the "best" science means applying "sound and objective scientific practices" to the particular statutory task that EPA is authorized to

perform. *Id.* It does not empower EPA to undertake *new* tasks that are *not* otherwise authorized.[8] Nor can EPA expand its own authority just by deeming it a "best" practice to do so.

Similarly unavailing is the Government's ratification argument (at 44) that Congress added the health advisory authority "knowing that EPA had been considering relative source contributions when issuing such advisories under other SDWA authorities." Even where Congress "reenact[s]" statutory text *verbatim* after an agency promulgates formal, binding "regulations" interpreting that very text, the reenactment does not ratify the agency's position unless "Congress evidence[s] its awareness of those regulations." *Ohio v. Dep't of Interior*, 880 F.2d 432, 458 (D.C. Cir. 1989). Here, by contrast: (1) EPA did not reenact those "other SDWA authorities" verbatim; (2) prior EPA guidance on relative source contributions did not take the form of binding regulations; (3) prior guidance did not interpret the statute's text; and (4) there is no "evidence" that Congress was aware of the guidance.

---

[8] For similar reasons, the Government cannot rely (at 45) on a provision requiring EPA to apply "the best available science" to "risks associated with exposure to radon." *Id.* § 300g-1(b)(13)(B)(i). This provision *expressly* requires EPA to consider "residential exposure." For health advisories, by contrast, Congress has limited EPA's jurisdiction to a "substance or matter in water."

The Government's only other response (at 45) is to deny that the Health Advisory even applies to "other pathway[s] of exposure." According to the Government (*id.*), the advisory "merely recognizes … that people could *also* be exposed to HFPO-DA through non-drinking water sources." EPA did not "merely *recognize*" the possibility of non-drinking-water exposures; it *relied on* them in order to increase the Health Advisory's sensitivity fivefold, setting a level for HFPO Dimer Acid based *primarily* (80%) on those other sources.

EPA's dangerously expansive argument would give it "the effective ability [under the SDWA] to regulate contaminant exposures that are governed by *other* statutes, some of which are administered by *other* agencies." Chemours Br. 46. Indeed, EPA's argument implies that when Congress gives an agency authority over *one* source of exposure, the agency *automatically* has power to take account all *other* exposures. That cannot be right. By that logic, moreover, "the *less* exposure that comes from drinking water, the *more sensitive* a health advisory level it can set." *Id.*

Finally, although the SDWA's plain language makes resort to the major questions doctrine unnecessary, the doctrine reinforces the text: Giving EPA authority to ratchet up the sensitivity of health advisories multifold based on non-statutory exposures would dramatically expand EPA's jurisdiction. In

response, the Government reasserts (at 46-48) that health advisories have no real effect and that relying on non-drinking-water exposures is a "best" scientific practice. The Government also says (at 47) that EPA's practice of relying on non-drinking-water exposures under the SDWA is "longstanding." But the doctrine applies even to "longstanding practice[s]," *Georgia v. President of the U.S.*, 46 F.4th 1283, 1316 (11th Cir. 2022) (Anderson, J., dissenting in relevant part), if the agency tries to invoke an ancillary provision to give itself a "highly consequential power," *id.* at 1296 (majority) (cleaned up). That accurately describes EPA's reliance on the best-science provision as a supposed implicit grant of jurisdiction over non-drinking-water exposures.

## B. EPA Failed to Justify Its Exposure Assumption

EPA's own guidance precludes reliance on the 20% default exposure assumption unless "adequate exposure data do not exist." JA147. Yet despite dozens of exposure studies for HFPO Dimer Acid, the Health Advisory relies on the default. EPA has not adequately justified that decision.

EPA's only discussion of that issue is as follows:

> [P]otential sources other than drinking water ingestion were identified .... However, the available information is limited. The available information does not allow for the quantitative characterization of the relative levels of exposure among these different sources .... .

JA36-37. The agency never explained *why* the chemical-specific data—including dozens of studies, gray-literature sources, and references, JA62-64—nevertheless qualified as "limited." Nor did EPA explain *why* "quantitative characterization" was impossible, given that quantitative data were available in every category the agency considered. JA33-37. The agency's conclusory assertion "falls far short of the *reasoned* consideration Congress clearly intended." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986) (cleaned up).

The Government defends this failure by touting (at 41) EPA's "reliance on … studies detecting HFPO-DA exposure through non-drinking water sources." A red-herring: EPA did not choose a 20% exposure assumption *affirmatively* based on evidence showing that 80% of exposure to HFPO Dimer Acid would come through other sources; the agency chose 20% *as a default* because "available information is limited." JA37. *That* is the conclusion EPA was required to justify—but did not.

Similarly, the Government cannot blame Chemours (at 42) for not "identify[ing]" studies "that quantif[y] the exposure through drinking water as compared to other exposure media," and not "offer[ing] a *specifically calculated* relative source contribution value EPA should have used." The

agency chose to rely on the 20% default; the agency bears responsibility for sustaining that choice.

Finally, the Government *admits* (at 41 n.10) "the agency did not consider documents Chemours submitted that were not peer-reviewed, scientific studies." The Government falsely asserts (*id.*) that ignoring such data and analysis was "[c]onsistent with EPA's mandate to use the 'best available, peer reviewed science.'" In fact, Congress commanded that EPA "shall use" not only (i) peer-reviewed studies but also "(ii) data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data)." 42 U.S.C. § 300g-1(b)(3)(A)(ii). In overlooking Chemours's data—which was rigorous and reliable—EPA ignored half its statutory mandate.

## C.    EPA Relied on Unsupported Toxicity Assumptions

***Irrelevant rodent effects***. The Health Advisory relies on liver effects in rodents, occurring through the PPAR-alpha mode of action, that are irrelevant to humans. JA31. The Government claims (at 49) that Chemours focused on only "one type of liver effect" (apoptosis), while EPA's studies "considered ... *multiple* types of liver effects, including apoptosis, and *also* various types of necrosis, as well as increased serum liver enzyme concentrations." That

mischaracterizes Chemours's argument, which has never been limited to apoptosis. Chemours has consistently argued that *all* liver effects—*including* necrosis and enzyme concentrations—are related to PPAR-alpha. JA943-47. Chemours supported these argument with substantial data, *see* JA947-48, 976, 988, 991-93 (necrosis); JA977, 999-1000, 1014 (enzymes), which EPA simply ignored.

EPA also ignored the crucial Chappell study, which found that *all* the rodent liver effects "are PPAR-alpha effects." JA943 (citing JA1071-85). The Government attempts to justify that omission (at 51) on grounds that the Chappell study "looked for evidence of a PPAR-alpha and apoptosis, but did not investigate *other* modes of action or types of cell death." Incorrect: The Chappell study explicitly states that "other transcriptional targets and/or mechanisms related to liver toxicity were also investigated." JA1082. By failing to address the study, EPA overlooked "the best available, peer-reviewed science." 42 U.S.C. § 300g-1(b)(3)(A)(i).

The Government relies (at 49) on the "Hall criteria" to support EPA's claim that the full "constellation" of liver effects *are* relevant to humans. But as Chemours explained, the Hall criteria predate efforts to "distinguish" necrotic and apoptotic cell death using the more-refined "Elmore criteria."

JA947. The distinction is important because apoptosis, not necrosis, can be a downstream effect of PPAR-alpha. JA947-48. EPA again failed to respond.

The Government touts (at 50-51) work by the Pathology Working Group, led by Dr. Elmore herself. But EPA failed to explain "important discrepancies" raised by Chemours between the diagnostic criteria used by the Group and the Elmore criteria. JA948. In any event, the Group's findings were "confine[d]" to studies involving mice, JA92, thus limiting their relevance, JA949-50. Notably, the Group did not *itself* claim that rodent-study findings were indicative of effects in humans. Nor, despite the Government's assertion (at 50), did the Group conclude that "exposure to HFPO-DA caused a 'constellation of liver effects.'" The Group in fact distinguished between separate effects, JA140; it was *EPA* that (improperly) combined them into a single dataset.

***Inflated uncertainty factors***. The Government asserts (at 53) that increasing the subchronic-to-chronic uncertainty factor became necessary when EPA "changed its assessment of the most sensitive population from parental males to lactating females," since females were tested for shorter durations. But as Chemours explained, EPA's guidance *already* addressed both "developmental" and "maternal toxicity" endpoints, stating that "*an*

*uncertainty factor is not applied to account for duration of exposure*." JA1020 (quoting JA505). The Government argues (at 52) that this guidance applies only to derivation of a reference dose for developmental toxicity, not to derivation of a chronic reference dose. Also incorrect: The guidance addresses "maternal toxicity," which is used to develop a chronic reference dose, and makes clear that such effects are addressed through other adjustments—*not* through "duration" factors. JA505.

Finally, to support increasing the database uncertainty factor from 3 to 10, the Government references (at 54) studies that supposedly "elucidated areas needing more study with respect to previously unknown health effects." But Chemours *already* addressed those studies in its Request for Correction, explaining why they do not justify increasing the database uncertainty factor. JA951-52. Chemours also submitted an "expert report" that reviewed them and found "'no scientifically defensible way to justify increasing the database uncertainty factor based on [EPA's new] studies.'" JA952 (quoting JA1029). EPA never responded.

### D. EPA's Failure to Consider Costs Is Unlawful

The Government admits (at 55) that "EPA ... Did Not Consider Costs in the Advisory." That admission is dispositive: EPA's authority to issue health

advisories is limited to "appropriate actions," 42 U.S.C. § 300g-1(b)(1)(F), and any "'appropriate'" exercise of agency authority "requires at least some attention to cost," *Michigan v. EPA*, 576 U.S. 743, 752 (2015).

Apart from reasserting (at 55) that health advisories are "purely informational," the Government attempts (at 56) to distinguish *Michigan* on the ground that EPA's authority to issue health advisories is focused "exclusively" on a single consideration: "public health effects." 42 U.S.C. § 300g-1(b)(3)(B).

Yet the Government lost the same argument in *Michigan*, where the relevant provision authorized EPA to combat "hazards to public health." *Id.* § 7412(n)(1)(A). What mattered was that "Congress instructed EPA" to address that consideration *in a particular manner*: "if (but only if) the Agency finds [action] 'appropriate and necessary.'" 576 U.S. at 752. The presence of that additional constraint led the Supreme Court to distinguish *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001), where Congress imposed *only* a single "discrete criterion," but did *not* further limit the agency to "appropriate and necessary" actions. 576 U.S. at 755-56. Here, the additional constraint on EPA—take only "appropriate" action—"plainly subsumes consideration of cost." *Id.* at 756; *see MetLife, Inc. v. Fin. Stability*

*Oversight Council*, 177 F. Supp. 3d 219, 241 (D.D.C. 2016) ("The same textual hook in 12 U.S.C. § 5323(a)(2)(K) ('appropriate') would thus require FSOC to consider the cost" of its actions).

The Government argues (at 56) that "the SDWA has numerous other sections not related to health advisories in which Congress" directed EPA to consider "cost." *Michigan* rejected that argument too:

> EPA points out that other parts of the Clean Air Act expressly mention cost, while § 7412(n)(1)(A) does not. But this observation shows only that § 7412(n)(1)(A)'s broad reference to appropriateness encompasses *multiple* relevant factors (which include but are not limited to cost) ....

576 U.S. at 754-55; *see MetLife*, 177 F. Supp. 3d at 241 ("FSOC points to adjacent terms in Dodd-Frank that expressly mention cost. But the *Michigan* Court considered and rejected the same argument.") (citation omitted); *Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 61-62 (D.D.C. 2020) (similar). EPA's failure to consider costs thus "is enough to decide" that it acted improperly. *Michigan*, 576 U.S. at 758.

## IV. THE SDWA INADEQUATELY CONSTRAINS EPA'S AUTHORITY

The Government argues (at 57-58) that EPA's authority is not "legislative," recycling claims that health advisories "do not require anything of anyone" and generate consequences only "indirectly." But if Chemours is right that EPA's decision is "one by which rights or obligations have been

determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 178 (cleaned up), then by definition it will "alter[] the legal rights, duties and relations of persons … outside the legislative branch," *INS v. Chadha*, 462 U.S. 919, 952 (1983).

The only remaining question is whether Congress meaningfully constrained EPA's discretion to issue health advisories. The Government points (at 60-62) to supposed "guides [for] EPA's implementation," namely:

- Health advisories must focus on health effects of otherwise unregulated contaminants in water; and

- they must rely on the "best" science and be comprehensive and understandable.

These "guides" say nothing about *which* unregulated contaminant should be addressed and *what standard* should apply. Absent those two fundamental constraints, EPA can essentially set its own goals for whatever substances the agency chooses—or, if it prefers, for none at all. And the Government's claim (at 55-56) that health goals need not be balanced against costs would give EPA carte blanche not merely to pick its goals, but to achieve them at any cost.

However forgiving the intelligible-principle standard may be, it does not permit Congress to empower an agency to act "or not, as [it] sees fit, and to change [its] policy for any reason and at any time." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (cleaned up). EPA claims that kind of power here.

# CONCLUSION

The Court should grant the Petition.


Date: August 11, 2023

Respectfully submitted,

Allon Kedem
Brian D. Israel
Joel M. Gross
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
Fax: (202) 942-5999

*Counsel for The Chemours Company FC, LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I further certify that one paper copy each of the foregoing document was served via UPS on counsel for Respondents and Intervenors at the following addresses:

| | | |
|---|---|---|
| Kimere J. Kimball | Robert M. Sussman | Charles R. Corbett |
| Andrew D. Knudsen | Sussman & Associates | Sarah C. Tallman |
| U.S. Department of Justice | 3101 Garfield Street, NW | Natural Resources Defense Council |
| Env't & Natural Resources Div. | Washington, DC 20008 | 1152 15th St. NW, Ste. 300 |
| P.O. Box 7611 | | Washington, DC 20005 |
| Washington, DC 20044 | | |

Dated: August 11, 2023

Allon Kedem

# CERTIFICATE OF COMPLIANCE

1.      The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 6,499 words.

2.      The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century 14-point font.

3.      In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Petitioner's Final Reply Brief, as electronically filed on August 11, 2023, is identical to the text of the Brief to be submitted in paper copy.

4.      In accordance with Third Circuit Local Appellate Rule 31.1(c), Petitioner's Final Reply Brief, as electronically filed on August 11, 2023, was scanned with a virus detection program, namely Microsoft Defender (Version 1.371.607.0), and no virus was detected.


 Dated: August 11, 2023                      _____
                                            Allon Kedem