**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2287
_____

THE CHEMOURS COMPANY FC, LLC,
                                 Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY; ADMINISTRATOR ENVIRONMENTAL
PROTECTION AGENCY

LACEY BROWN; CAPE FEAR RIVER WATCH; CENTER
FOR ENVIRONMENTAL HEALTH; CLEAN CAPE FEAR;
DEMOCRACY GREEN; KYLE HORTON; NATURAL
RESOURCES DEFENSE COUNCIL; NORTH CAROLINA
BLACK ALLIANCE; HARPER PETERSON; DEBRA
STEWART; TOXIC FREE NORTH CAROLINA;
MICHAEL WATERS*,
                                 Intervenors

(*Pursuant to the Court's Order dated 2/6/23)

---

On Petition for Review of an Action by the
United States Environmental Protection Agency
(EPA No. 822/R-22/005)

---

Argued on January 31, 2024

Before: CHAGARES, *Chief Judge*, RESTREPO and
FREEMAN, *Circuit Judges*

(Opinion filed: July 23, 2024)

---

Allon Kedem　　　　　　　　[**ARGUED**]
Dana Or
Arnold & Porter Kaye Scholer
601 Massachusetts Avenue NW
Suite 1121
Washington, DC 20001

    *Counsel for Petitioner*

Thomas A. Lorenzen
Crowell & Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004

    *Counsel for Amicus Chamber of Commerce of the United States of America*

    Kimere J. Kimball       [**ARGUED**]
    Andrew D. Knudsen     [**ARGUED**]
    United States Department of Justice
    Environment & Natural Resources Division
    P.O. Box 7611
    Ben Franklin Station
    Washington, DC 20044
        *Counsel for Respondents*

    Robert M. Sussman, I
    Sussman & Associates
    3101 Garfield Street NW
    Washington, DC 20008

    Simi Bhat
    Sarah C. Tallman
    Natural Resources Defense Council
    111 Sutter Street
    21st Floor
    San Francisco, CA 94104
        *Counsel for Intervenors*

---

**OPINION OF THE COURT**

---

FREEMAN, *Circuit Judge*.

In 2022, the Environmental Protection Agency (EPA) published a health advisory for HFPO-DA—a chemical found in drinking water. Contending that the advisory was unlawful, the Chemours Company petitioned for review of EPA's action. We will dismiss the petition for lack of subject matter jurisdiction because the health advisory is not a final agency action.

**I**

Congress enacted the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300f *et seq.*, to protect the quality of drinking water. To further that goal, the statute authorizes EPA's Administrator to take various actions against contaminants in waters. *Id.* § 300g-1. One possible action is a regulation. *Id.* EPA will promulgate a regulation if the Administrator determines that: (1) the contaminant may have an adverse effect on health; (2) there is a substantial likelihood that the contaminant will occur in public water systems at a frequency that presents concern; and (3) a regulation would reduce the risk of the contaminant. *Id.* § 300g-1(b)(1)(A). Before promulgating a regulation for drinking water, EPA must undergo notice-and-comment procedures. *Id.* §§ 300g-1(b)(1)(A)–(E).

If the Administrator determines that a contaminant need not be regulated under the SWDA, the statute permits the agency to take a different action: publish a health advisory. *Id.* § 300g-1(b)(1)(F). The SDWA states that health advisories "are not regulations." *Id.* EPA describes health advisories as nonbinding documents that primarily serve to "provide information" about a safe level of a contaminant so that government officials and managers of public water systems can "determine whether actions are needed to address the presence of [the] contaminant in drinking water." JA 12.

When EPA develops a health advisory, it takes three categories of information into account: (1) a toxicity assessment, (2) exposure factors, and (3) the relative source contribution.[1] A toxicity assessment is a scientific and technical report that evaluates the health hazards the contaminant poses. The assessment calculates the contaminant's "chronic reference dose"—the estimated amount of the contaminant to which humans can be exposed per day "without an appreciable risk of deleterious effects during a lifetime." JA 574. Toxicity assessments undergo peer review and public comment before they are finalized and incorporated into health advisories.

Exposure factors are factors related to human activities, behaviors, and characteristics that help determine drinking water intake and an individual's exposure to a contaminant.

---

[1] EPA, *Drinking Water Health Advisory: Hexafluoropropylene Oxide (HFPO) Dimer Acid (CASRN 13252-13-6) and HFPO Dimer Acid Ammonium Salt (CASRN 62037-80-3)*, vii–viii (June 2022), https://perma.cc/379X-Q3G3; *see also* JA 9–10.

EPA estimates the drinking water intake for both the general population and sensitive populations so that the health advisory is "the most health protective." JA 28.

The relative source contribution addresses where the contaminant exists other than in drinking water. It is calculated so the health advisory's recommended safe level of the contaminant in drinking water, when combined with other identified sources of the contaminant, will not result in unsafe lifetime exposure.

With the final toxicity assessment, exposure factors, and relative source contribution in hand, EPA may publish a health advisory to inform decisionmakers of what it deems is a safe level of the contaminant in drinking water.

## II

The Chemours Company uses Hexafluoropropylene Oxide Dimer Acid and its ammonium salt (collectively, HFPO-DA) to manufacture polymers. EPA has detected HFPO-DA in surface water, groundwater, rainwater, and drinking water, and it has identified polymer manufacturers as a potential source.

In 2018, EPA began the process of developing a health advisory for HFPO-DA. By October 2021, it had developed and published a final toxicity assessment for HFPO-DA, which calculated a chronic reference dose of 0.00008 milligrams per kilogram of body weight per day. EPA estimated that the drinking water intake for lactating women—the group it determined was most sensitive to HFPO-DA—was 0.0469 liters per kilogram of body weight per day. EPA also estimated that 20% of individuals' exposure to HFPO-DA comes from

drinking water, with the remaining 80% coming from other sources. Using these three pieces of information, EPA issued a health advisory for HFPO-DA in June 2022. It concluded that HFPO-DA would not lead to adverse human health effects over a lifetime if the concentration in drinking water remained at or below 10 nanograms per liter.[2]

In July 2022, Chemours petitioned us for review of the HFPO-DA health advisory. It invoked the section of the SDWA that allows petitions for review of "any . . . final action of the Administrator under this chapter." 42 U.S.C. § 300j-7(a)(2). Chemours argues that the health advisory violates both the procedural and substantive requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, and the nondelegation doctrine.

### III

Our discussion of this matter begins and ends with jurisdiction. The SDWA confers jurisdiction upon certain Courts of Appeals to review certain agency actions. 42 U.S.C. § 300j-7(a)(2); *see W.R. Grace & Co. v. EPA*, 261 F.3d 330, 338 (3d Cir. 2001); *City of Portland v. EPA*, 507 F.3d 706, 710

---

[2] In March 2023, EPA issued advanced notice of proposed rulemaking for HFPO-DA. 88 Fed. Reg. 18638 (Mar. 29, 2023). It published a regulation for HFPO-DA on April 26, 2024. 40 C.F.R. § 141 *et seq.* When Chemours filed this petition, however, EPA had not yet promulgated the regulation. *See W. Union Tel. Co. v. FCC*, 773 F.2d 375, 378 (D.C. Cir. 1985) ("[A] challenge to now-final agency action that was filed before it became final must be dismissed.").

(D.C. Cir. 2007). The type of agency action is key. The statute states:

> A petition for review of—
>
> (1) actions pertaining to the establishment of national primary drinking water *regulations* . . . may be filed only in the United States Court of Appeals for the District of Columbia circuit; and
>
> (2) *any other final action* of the Administrator under this chapter may be filed in the circuit in which the petitioner resides or transacts business which is directly affected by the action.

42 U.S.C. § 300j-7(a) (emphases added).[3]

---

[3] Because we view the finality requirement as jurisdictional, *see W.R. Grace & Co.*, 261 F.3d at 338, and we are free "to choose among threshold grounds for denying audience to a case on the merits," *Ruhrgas AG. v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), we need not address the other jurisdictional issue raised in this matter: whether Chemours has standing. Additionally, because we decide this case on jurisdictional grounds, the Supreme Court's recent decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), does not affect our analysis.

Chemours does not contend that the HFPO-DA health advisory pertains to a drinking water regulation, as required for a petition pursuant to § 300j-7(a)(1). Instead, it asserts that we have jurisdiction under § 300j-7(a)(2) because, in its view, the health advisory is a "final action of the [EPA] Administrator." *Id.* § 300j-7(a)(2).[4] We disagree.

Two conditions must be satisfied for an agency action to be "final."[5] First, the action must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (cleaned up); *U.S. Army Corps of Eng'rs v. Hawkes Co.*,

---

[4] Chemours asserts (and EPA does not contest) that venue would be proper in this Circuit because Chemours is headquartered in Delaware and has facilities in New Jersey that are affected by the health advisory.

[5] Although the Supreme Court has said these two requirements "generally" apply, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016); *Bennett v. Spear*, 520 U.S. 154, 177 (1997), it has not recognized any exceptions to that general rule. One exception may be when Congress deems an agency action to be final. *See, e.g.*, 20 U.S.C. § 107d-2 (providing that decisions of arbitration panels convened pursuant to the Randolph-Sheppard Act are "subject to appeal and review as a final agency action for purposes of [the APA]"). Here, however, there is no reason to depart from the general rule.

578 U.S. 590, 597 (2016) (citing *Bennett*'s two-prong test approvingly).[6]

We need not address *Bennett*'s first requirement because the HFPO-DA health advisory fails to satisfy the

---

[6] In some matters, in addition to addressing the *Bennett* test, we have reviewed five factors to determine whether an agency action is final. *See, e.g.*, *Ocean Cnty. Landfill Corp. v. EPA*, 631 F.3d 652, 655 (3d Cir. 2011). *But see Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Env't Prot.*, 870 F.3d 171, 176–78 (3d Cir. 2017) (considering only the *Bennett* test). Those factors are:

> 1) whether the decision represents the agency's definitive position on the question; 2) whether the decision has the status of law with the expectation of immediate compliance; 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision involves a pure question of law that does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act.

*Ocean Cnty. Landfill Corp.*, 631 F.3d at 655 (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 n.7 (3d Cir. 2003)). The first two factors mirror the *Bennett* test, and the remaining factors arise from pre-*Bennett* authority. *See Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1080 (3d Cir. 1989). The parties do not argue that they are relevant here, so we do not address them.

second: it does not alter any party's rights or obligations. The health advisory provides guidance, but it imposes no obligations, prohibitions, or restrictions. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

The health advisory also does not give rise to any "direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178. Congress foreclosed the possibility of direct legal consequences when it stated that "health advisories . . . are not regulations[]." 42 U.S.C. § 300g-1(b)(1)(F); *see Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 862 (4th Cir. 2002) (holding that an agency report was not final in part because the authorizing statute disclaimed any regulatory effect). And EPA characterizes the health advisory as a "non-enforceable, non-regulatory" informational document. JA 12. That characterization is consistent with the health advisory's content. *See New Jersey v. U.S. Nuclear Regul. Comm'n*, 526 F.3d 98, 102 (3d Cir. 2008) (giving weight to an agency's characterization of its action in a finality analysis). Indeed, the health advisory establishes no direct consequence for parties who choose to disregard EPA's advice about safe HFPO-DA levels in drinking water. EPA cannot enforce the health advisory, and there is no separate enforcement mechanism. *See Hawkes*, 578 U.S. at 599–600 (stating that agency actions are final where enforcement proceedings carry the risk of civil or criminal penalties).

Chemours resists this conclusion, arguing that EPA, Congress, and some states may rely on the HFPO-DA health advisory's guidance to exercise power. But the consequences Chemours invokes are not *direct* consequences of the health advisory. In each of Chemours's examples, EPA or a separate actor must take *an additional action* to create any consequence.

For instance, Chemours points to the SDWA provision that authorizes EPA's Administrator to take emergency actions when a contaminant in drinking water presents an imminent danger to public health. 42 U.S.C. § 300i. Permissible emergency actions include issuing orders to provide alternative water supplies and commencing civil actions, and noncompliance with an emergency order may lead to a monetary fine. *Id.* EPA's Administrator could take emergency action if HFPO-DA exceeds the health advisory level.[7] But it is *the emergency action itself*—not the health advisory—that would bring about direct legal consequences. *Cf. Dalton v. Specter*, 511 U.S. 462, 469 (1994) (holding that reports submitted by the Secretary of Defense to the President were not final agency actions because the reports did not directly affect military bases—the President's approval of the reports did); *Hindes v. F.D.I.C.*, 137 F.3d 148, 162–63 (3d Cir. 1998) (holding that FDIC's letter to a bank warning it of a violation that may result in closure was not a final action in part because the letter did not close the bank—the state, relying on the letter, did).

Chemours also argues that the HFPO-DA health advisory imposes legal consequences under a separate federal statute: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.

---

[7] *See* EPA Memorandum, *Updated Guidance on Emergency Authority under Section 1431 of the Safe Drinking Water Act*, 9–10 (May 30, 2018), https://perma.cc/EJ7G-3GSW (stating that EPA may use its emergency authority in the case of "exposure, or threat of exposure, to chronic contaminants at levels exceeding their . . . health advisory levels").

§ 9601 *et seq.* CERCLA governs how authorities may respond to releases of hazardous substances into the environment. *Id.* §§ 9604(a), (d). It permits authorities to require the party who introduced the hazardous substance to clean it up using governmental standards applicable to the particular substance. *Id.* § 9621(d)(2)(A); 40 C.F.R. §§ 300.400(g)(1), (4). So if too much HFPO-DA were to infiltrate a water system and Chemours were deemed responsible, Chemours could be required to reduce the HFPO-DA level to below the recommended level in the HFPO-DA health advisory. *See* 40 C.F.R. § 300.400(g)(3).

According to Chemours, CERCLA makes the HFPO-DA health advisory legally binding. But nothing in CERCLA (or its implementing regulations) requires authorities to incorporate the HFPO-DA health advisory in their hazardous substance clean-up plans. *Id.* (providing that "agencies *may*, as appropriate, identify other advisories, criteria, or guidance to be considered . . . in developing CERCLA remedies." (emphasis added)); *see also Sierra Club v. EPA*, 955 F.3d 56, 64 (D.C. Cir. 2020) (finding guidance not final where it "preserve[d] state discretion"). So any legal consequences that result from an agency's actions under CERCLA flow from those actions, not from the health advisory itself. *Cf. Hindes*, 137 F.3d at 163 ("[W]here a state actor relies upon a federal agency's notice, the state action does not convert the notice into a final agency act . . . .").

Finally, Chemours argues that legal consequences flow from the HFPO-DA health advisory when states incorporate it into their programs and regulations. For instance, Utah incorporates the health advisory into its Underground Injection Control (UIC) program—an initiative administered under the SDWA to regulate waste being injected into underground

sources of drinking water.[8]  According to Chemours, because a party who violates Utah's UIC program faces enforcement action, legal consequences flow from the health advisory.  But as with independent actions under CERCLA, Utah independently incorporated the HFPO-DA health advisory level into its UIC requirements.  Any legal consequences flowing from Utah's UIC requirements are therefore not direct consequences of the HFPO-DA health advisory.  *Hindes*, 137 F.3d at 162–63.

In sum, for each of Chemours's examples, consequences may flow from actions taken to incorporate the HFPO-DA health advisory, but they cannot flow directly from the health advisory itself.  EPA issued the health advisory to "help communities make informed decisions about [HFPO-DA] to better protect human health."  JA 12.  Repercussions that result do not convert the health advisory into a final action.  *See Hindes*, 137 F.3d at 162–63; *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 168 (6th Cir. 2017).  And although the health advisory may persuade some decisionmakers to act, that does not make it a final agency action, either.  *See Flue-Cured*

---

[8] EPA, *Underground Injection Control Program* (April 2020), https://perma.cc/U4RN-MWY2.  States administer UIC programs and have primary enforcement responsibility for underground water sources. 42 U.S.C. § 300h-1.  Where states do not commence appropriate enforcement action against individuals who violate UIC requirements, EPA has authority to require compliance and initiate civil actions.  *Id.* § 300h-2(a)(2).  Utah requires that parties who seek a UIC permit meet certain standards, including those outlined in EPA health advisories.  U.A.C. R317-7-6.5.

14

*Tobacco Coop. Stabilization Corp.*, 313 F.3d at 859–60 (observing that, in *Franklin v. Massachusetts*, 505 U.S. 788, 790 (1992) and *Dalton*, 511 U.S. at 466, "the persuasive value and practical barriers associated with the agencies' recommendations were insufficient to create reviewable agency action under the APA").[9]

\* \* \*

Because the HFPO-DA health advisory is not a final agency action, we will dismiss the petition for lack of jurisdiction.

---

[9] As a final plea for reviewability, Chemours argues in its reply brief that the health advisory need not be self-executing to be challengeable. It cites *Sackett v. EPA* for the proposition that "the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction." 566 U.S. 120, 129 (2012). But *Sackett* involved an EPA compliance order that imposed upon the challengers "the legal obligation" to restore the wetlands on their property and to provide EPA with access to those wetlands and documents related to the wetlands' condition. *Id.* at 126. Unlike the HFPO-DA health advisory, the compliance order in *Sackett* determined a party's obligations, thus satisfying *Bennett*'s second finality requirement. *Id.* (citing *Bennett*, 520 U.S. at 178). The compliance order also satisfied *Bennett*'s first requirement that it "mark[] the consummation of the Agency's decisionmaking process." *Id.* at 127 (cleaned up). Given this, finality was established regardless of whether the compliance order was self-executing. *Id.* at 129.